**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

SANTA ROSA ORTHOPAEDIC MEDICAL GROUP, INCORPORATED, individually, and on behalf of all others similarly situated

Plaintiff,

v.

CHANGE HEALTHCARE INC., a Delaware Corporation;
UNITEDHEALTH GROUP INCORPORATED, a Delaware Corporation;
UNITEDHEALTHCARE INC., a Delaware Corporation;
OPTUM, INC., a Delaware Corporation,

Defendants.

Case No.: ______________________

**COMPLAINT – CLASS ACTION**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION ........ 1

II. PARTIES ........ 2

III. JURISDICTION AND VENUE ........ 4

IV. FACTUAL ALLEGATIONS ........ 4

A. Defendants Are Responsible for Critical Functions Within the Healthcare System ........ 4

B. Defendants Failed to Safeguard Private Information, Resulting in the February 2024 Data Breach ........ 6

C. The Data Breach Has Paralyzed the Healthcare System, Causing Substantial Harm to Providers ........ 8

D. The Data Breach Was Highly Foreseeable ........ 9

E. Defendants Owed a Duty to Plaintiff and Class Members ........ 10

F. Plaintiff's Experience ........ 12

V. CLASS ACTION ALLEGATIONS ........ 13

COUNT ONE NEGLIGENCE (On Behalf of Plaintiff and the Class) ........ 16

VI. PRAYER FOR RELIEF ........ 19

VII. JURY TRIAL DEMANDED ........ 19

## I. INTRODUCTION

1. Plaintiff Santa Rosa Orthopaedic Medical Group, Incorporated, on behalf of itself and all others similarly situated alleges the following against Defendants Change Healthcare Inc. ("Change Healthcare"), UnitedHealth Group Incorporated ("UnitedHealth Group"), UnitedHealthcare, Inc. ("UnitedHealthcare"), and Optum, Inc. ("Optum") (collectively, "Defendants") based upon corporate knowledge with respect to itself and on information and belief as to all other matters.

2. Change Healthcare provides revenue and payment cycle management that connects payers, providers, and patients within the U.S. healthcare system. Change Healthcare is the largest clearinghouse for insurance billing and payments in the United States, processing 15 billion health care transactions annually. It is also the largest commercial prescription processor in the country. According to Change Healthcare, its systems are "in the center of the healthcare ecosystem."[1]

3. On approximately February 21, 2024, Change Healthcare was subject to the most significant and consequential cyberattack on the U.S. health care system in American history (the "Data Breach"). On February 22, 2024 UnitedHealth Group filed a Form 8-K with the Securities and Exchange Commission confirming that Change Healthcare's systems had been accessed by an unauthorized party.

4. Shortly thereafter, the notorious ransomware group known as ALPHV/BlackCat ("ALPHV Blackcat") claimed responsibility for the cyberattack. ALPHV Blackcat also publicly stated that the information compromised in the Data Breach includes personally identifiable information ("PII") and protected health information ("PHI"), including patient medical and

[1] Change Healthcare, *Data Rights & Usage,* https://www.changehealthcare.com/government-affairs#:~:text=Change%20Healthcare%20occupies%20a%20unique,drive%20cost%20efficiency%20in%20healthcare (last visited April 4, 2024).

patient payment information.

5. The Data Breach was a direct and proximate result of Defendants' failure to take adequate measures to protect against the foreseeable cyberattack. Defendants were aware that the sensitive personal data involved in the Data Breach is highly sought after by hackers who aim to exploit that information. Defendants' failures to undertake adequate security measures breached their duties to safeguard PII and PHI under statute and industry standards, among other sources.

6. Following the Data Breach, Defendants took Change Healthcare's systems offline, paralyzing much of the United States healthcare system and essentially shutting down payment processing. As a result, Plaintiff and a class of health care providers have been left to suffer substantial and ongoing financial harm to their businesses. The American Hospital Association has discussed the "staggering loss of revenue" resulting from the Data Breach.

7. Despite the fact that Defendants were well aware they were prime targets for a cyberattack, they failed to implement adequate security measures to prevent the Data Breach. Defendants likewise failed to implement any policies, procedures, or functions that would allow healthcare providers, like Plaintiff and the proposed Class, to continue to operate their businesses in the event of a cybersecurity incident such as the Data Breach.

8. Plaintiff brings this lawsuit on behalf of a proposed Class of healthcare providers whose businesses have been disrupted by the effects of the Data Breach.

## II. PARTIES

9. Plaintiff Santa Rosa Orthopaedic Medical Group, Incorporated is a medical services provider incorporated in California, which maintains its principal place of business in Santa Rosa, California.

10. Defendant Change Healthcare Inc. is a Delaware corporation, which maintains its

principal place of business in Nashville, Tennessee. It became a subsidiary of United Health Group Incorporated in 2022 and is operated by Optum, Inc., another UnitedHealth Group subsidiary. Change markets itself as "Part of Optum."

11. Defendant UnitedHealth Group Incorporated is a Delaware corporation which maintains its principal place of business in Minnetonka, Minnesota. UnitedHealth is the parent corporation to UnitedHealthcare, Optum, and Change Healthcare. UnitedHealth Group exercises control over the management of the Change Healthcare cybersecurity practices, as reflected in UnitedHealth Group's February 22, 2024 Form 8-K disclosure referenced above. UnitedHealth Group maintains several offices within Tennessee including, upon information and belief, offices in Maryville, Kingston, Murfreesboro, and Cordova, Tennessee.

12. Defendant UnitedHealthcare, Inc. is a Delaware corporation which maintains its principal place of business in Minnetonka, Minnesota. UnitedHealthcare markets and sells insurance-related products and services within Tennessee, including health insurance coverage plans.

13. Defendant Optum, Inc. is a Delaware corporation which maintains its principal place of business in Eden Prairie, Minnesota. Optum has been a subsidiary of UnitedHealth Group since 2011 and is a parent corporation to Change Healthcare. Optum markets and sells insurance-related products and services within Tennessee.

14. At all times relevant to the events giving rise to this action, each and every Defendant was acting as an agent or employee of each of the other Defendants. Further, at all times relevant to those events, each and every Defendant was acting within the course and scope of that agency or employment at the direction of or with the full knowledge, permission, or consent of each and every other Defendant. In addition, each of the acts or omissions of each and every

Defendant was made known to, and ratified by, each of the other Defendants.

## III. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class (e.g., Plaintiff), as defined below, is a citizen of a different state than Defendant, there are more than 100 members in the putative class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

16. This Court has personal jurisdiction over Defendants. Defendant Change Healthcare is headquartered and conducts business in the state where this District is located. Each of the Defendants have sufficient minimum contacts with this state and have intentionally availed themselves of the benefits of doing business in this state, including through marketing and/or selling products and/or services and/or accepting and processing payments for those products and/or services within this state.

17. This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in Tennessee and because Defendant conducts a substantial part of its business within this District.

## IV. FACTUAL ALLEGATIONS

### A. Defendants Are Responsible for Critical Functions Within the Healthcare System

18. Change Healthcare is a healthcare services and support company providing revenue and payment cycle management that connects payers, providers, and patients within the United States healthcare system. Change Healthcare is the predominant source of more than 100 critical functions that keep the United States healthcare system operating. Among these functions, Change Healthcare manages the clinical criteria used to authorize a substantial portion of patient care and

coverage, processes billions of claims, supports clinical information exchange, and processes drug prescriptions.

19. According to Change Healthcare, the company processes 15 billion health care transactions annually and touches one in every three patient records.

20. Change Healthcare represents that its "extensive network, innovative technology, and expertise inspire a stronger, better coordinated, increasingly collaborative, and more efficient healthcare system." Change Healthcare further represents itself as a "trusted partner for organizations committed to improving the healthcare system through technology." Change Healthcare promises providers that its "advanced technology and services help . . . enhance patient engagement and access, improve outcomes, drive revenue performance, and improve operational efficiency." It also assures patients that its "solutions streamline the engagement, care, and payment experience to improve the patient journey."

21. In October 2022, Optum completed an acquisition of Change Healthcare. According to a press release UnitedHealth Group issued: "The combined businesses share a vision for achieving a simpler, more intelligent and adaptive health system for patients, payers and care providers. The combination will connect and simplify the core clinical, administrative and payment processes health care providers and payer depend on to serve patients. Increasing efficiency and reducing friction will benefit the entire health system, resulting in lower costs and a better experience for all stakeholders."

22. UnitedHealth Group exercises control over management of Change Healthcare's cybersecurity.

23. In order to provide the services described above, Defendants acquire, collect, and store the PII and PHI of the patients whom their pharmacies and healthcare providers service,

including those individuals' names, contact details, healthcare insurance information, medical records, dental records, and payment information. Change Healthcare's "Privacy Notice" publicized an extensive list of categories of personal information the company collects with respect to patients.[2]

24. Given Change Healthcare's position "in the center of the healthcare ecosystem" and its attendant collection and storage of vast quantities of PII and PHI, Defendants were especially vulnerable to a cyberattack.

### B. Defendants Failed to Safeguard Private Information, Resulting in the February 2024 Data Breach

25. Beginning on or around February 21, 2024, cybercriminals exploited a vulnerability in Defendants' software and accessed PII and PHI maintained on Defendants' servers.

26. On February 22, 2024, UnitedHealth Group filed a Form 8-K reporting that on February 21, 2024, UnitedHealth Group "identified a suspected nation-state associated cyber security threat actor" that had "gained access to some of the Change Healthcare information technology systems."[3]

27. On or about February 28, 2024, the notorious cybercrime group ALPHV Blackcat claimed responsibility for the Data Breach. According to information posted by a member of the ALPHV Blackcat group, 6 TB of data was stolen from UnitedHealth Group, including "highly selective data" from all Change Healthcare clients, including Medicare, CVS Caremark, Health Net, and Tricare, the U.S. military medical health agency. The group claims the data of millions

---

[2] Change Healthcare, *Privacy at Change Healthcare* (effective December 2023), https://www.changehealthcare.com/privacy-notice (last visited April 4, 2024).

[3] *See* UnitedHealth Group Inc., Current Report (Form 8-K), SECURITIES AND EXCHANGE COMMISSION (Feb. 22, 2024), https://www.sec.gov/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm (last accessed April 4, 2024).

of patients was stolen, including medical records, insurance records, dental records, payment information, claims information, and patients' PHI, including health data, contact information, and Social Security numbers. The group also claims to have stolen the source code of Change Healthcare applications.

28. On February 29, 2024, UnitedHealth Group reported: "Change Healthcare can confirm we are experiencing a cyber security issue perpetrated by a cybercrime threat actor who has represented itself to us as ALPHV/Blackcat."

29. According to publicly reported information, the Data Breach involved a ransomware attack, wherein the cybercriminals accessed Change Healthcare's systems and encrypted Change Healthcare's data to hold it hostage in seeking a ransom payment. It was reported that Change paid ALPHV Blackcat a ransom of 350 bitcoins, or approximately $22 million.

30. The vulnerabilities of Change's data systems allowed ALPHV Blackcat to bypass authentication restrictions and gain unauthorized access to customer environments. The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic data security procedures in order to protect PII and PHI.

31. On March 7, 2024, UnitedHealth Group announced that it was "working aggressively on the restoration of [its] systems and services." UnitedHealth Group further stated, "All of us at UnitedHealth Group feel a deep sense of responsibility for recovery and are working tirelessly to ensure that providers can care for their patients and run their practices, and that patients can get their medications. We're determined to make this right as fast as possible."[4]

---

[4] UnitedHealth Group, *UnitedHealth Group Update on Change Healthcare Cyberattack* (Mar. 7, 2024), https://www.unitedhealthgroup.com/newsroom/2024/2024-03-07-uhg-update-change-healthcare-cyberattack.html

## C. The Data Breach Has Paralyzed the Healthcare System, Causing Substantial Harm to Providers

32. Healthcare providers like Plaintiff and the Class rely on Defendants to receive payment for services and otherwise carry out essential business functions.

33. Immediately following the Data Breach, Defendants took Change Healthcare's critical services offline, bringing many of the processes supporting the United States healthcare system to a virtual standstill.

34. Change Healthcare's downed systems have hampered providers' ability to verify patients' health insurance coverage; process claims and receive payment from many payers; exchange clinical records with other providers; provide cost estimates and bill patients; and access the clinical guidelines used in clinical decision support tools and as part of the prior authorization process.

35. Patients have struggled to get timely access to care and billions of dollars have stopped flowing to providers.

36. Hospitals, health systems and other providers are experiencing extraordinary reductions in cash flow, threatening their ability to make payroll and to acquire the medical supplies needed to provide care.

37. In response to a recent American Hospital Association survey of hospitals with nearly 1,000 responses, 74 percent reported direct patient care impact, including delays in authorizations for medically necessary care.[5]

38. In the same survey, 94 percent of hospitals reported that the Change Healthcare cyberattack was impacting them financially, with more than half reporting the impact as

[5] Amer. Hospital Ass'n, *AHA Survey: Change Healthcare Cyberattack Significantly Disrupts Patient Care, Hospitals' Finances* (Mar. 2024), https://www.aha.org/2024-03-15-aha-survey-change-healthcare-cyberattack-significantly-disrupts-patient-care-hospitals-finances

"significant or serious."

39. The American Hospital Association explained in a letter to the Department of Health and Human Services that the Data Breach has substantially affected healthcare providers' ability to collect revenue: "[W]ithout this critical revenue source, hospitals and health systems may be unable to pay salaries for clinicians and other members of the care team, acquire necessary medicines and supplies, and pay for mission critical contract work in areas such as physical security, dietary and environmental services."[6]

40. Crucially, Defendants failed to implement any backup system that would allow Plaintiff and members of the proposed Class to continue to use Defendants' functions, including functions related to payment processing.

41. In sum, as a direct result of the Data Breach, physicians and healthcare providers have lost and continue to lose significant revenues, and otherwise suffer harm.

**D. The Data Breach Was Highly Foreseeable**

42. At all relevant times, Defendants were required to properly secure their computer networks and encrypt and maintain PHI and PII in such a manner to prevent foreseeable harm.

43. It is well known by those in the healthcare industry that PHI and PII are highly sensitive and are frequent targets of cybercriminals.

44. As early as 2014, the FBI notified healthcare companies in a "flash" alert that it had "observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining [PHI] and [PII]."[7]

---

[6] Amer. Hospital Ass'n, *AHA Letter to HHS on Implications of Change Healthcare Cyberattack* (Feb. 26, 2024), https://www.aha.org/lettercomment/2024-02-26-aha-letter-hhs-implications-change-healthcare-cyberattack

[7] Jim Finkle, *FBI warns healthcare firms they are targeted by hackers*, Reuters (August 20, 2014), https://www.reuters.com/article/idUSKBN0GK24U/ (last visited April 4, 2024).

45. PII has considerable value and constitutes an enticing target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[8]

46. PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

47. Because of the value of PHI, the healthcare industry, specifically, has become a prime target for threat actors. A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market.[9]

48. In 2023, the FBI reported 249 ransomware attacks in the healthcare industry.

49. In light of the data breaches at other companies, including many in the healthcare industry, Defendant knew that its electronic records and consumers' PII and/or PHI would be targeted by cybercriminals and ransomware attack groups, but failed to implement reasonable measures to prevent these attacks.

**E. Defendants Owed a Duty to Plaintiff and Class Members**

50. By obtaining, collecting, using, and deriving a benefit from PHI and PII, Defendants assumed duties and knew or should have known that it was responsible for protecting such information from unauthorized disclosure.

51. Defendants' duty to use reasonable security measures arose, in part, under HIPAA. Change Healthcare states on its website that it "functions as a HIPAA business associate for its HIPAA covered entity payer and provider customers as its primary business function, so Change

---

[8] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited April 4, 2024).

[9] *Managing Cyber Risks in an Interconnected World, Key Findings from the Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited April 4, 2024).

Healthcare's creation, collection, use, and disclosure of protected health information is guided by HIPAA[.]"[10] As businesses covered under HIPAA (45 C.F.R. § 160.102), Defendants are required to comply with HIPAA Rules, including the Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and the Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. HIPAA requires Defendants, among numerous other obligations, to "reasonably protect" PHI from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

52. Defendants' duty to use reasonable security measures also arose under Section 5 of the Federal Trade Commission Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45. The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for sensitive private information is an "unfair practice" in violation of Section 5. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

53. Defendants were also obligated to meet the standards set out in the National Institute of Standards and Technology's Security Rule compliance guide for industry and cybersecurity best practices, including encrypting data; requiring a key for data to be readable; using multi-factor authentication; adequately monitoring security systems; and adequately training staff on information security.

54. Additionally, in a Joint Cybersecurity Advisory issued on December 19, 2023, the FBI and the Cybersecurity & Infrastructure Security Agency ("CISA") encouraged critical

---

[10] Change Healthcare, *Privacy at Change Healthcare* (effective December 2023), https://www.changehealthcare.com/privacy-notice (last visited April 4, 2024).

infrastructure organizations, such as Defendants, to implement their various recommendations as set forth in the advisory to reduce the likelihood and impact of inevitable ALPHV Blackcat cyberattack efforts. The FBI and CISA provided various step-by-step technical details associated with the ALPHV Blackcat criminal organization and its attack techniques, and advised organizations of "actions to take today," which included "prioritize remediation of known exploited vulnerabilities."[11]

55. Defendants likewise knew that a breach of their computer system, and exposure of the information stored therein, would very likely necessitate taking their systems offline to address the resulting issues, thereby depriving healthcare providers of critical services. Accordingly, Defendants had a duty to implement a backup system that would fulfill the basic functions for Plaintiff and members of the proposed Class in the event of a cybersecurity incident such as the Data Breach.

**F. Plaintiff's Experience**

56. Plaintiff Santa Rosa Orthopaedic Medical Group, Incorporated ("Santa Rosa Orthopaedic") is a licensed healthcare provider serving patients in the Bay Area and has contracted with Defendants for purposes of medical claims processing.

57. Beginning on approximately February 21, 2024, after Defendants' systems went offline due to the Data Breach, Plaintiff Santa Rosa Orthopaedic could not submit claims for its services and obtain payments for those claims. Since February 21, 2024, Plaintiff Santa Rosa Orthopaedic has not been paid for any claims despite continuing to provide services to its patients. Plaintiff Santa Rosa Orthopaedic relies on the payments it receives from submitted claims to pay

[11] Joint Cybersecurity Advisory, *#StopRansomware: ALPHV Blackcat* (December 19, 2023), https://www.cisa.gov/sites/default/files/2024-03/aa23-353a-stopransomware-alphv-blackcat-update_2.pdf.

business expenses.

## V. CLASS ACTION ALLEGATIONS

58. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff SRO brings this action against Defendant on behalf of itself and all other entities similarly situated.

59. Plaintiff SRO seeks to represent a Nationwide Class, subject to amendment as appropriate, and defined as follows:

> All healthcare providers in the United States who submitted claims for payment through the Change Healthcare system since February 21, 2024.

60. In addition, Plaintiff SRO seeks to represent a California Class, subject to amendment as appropriate, and defined as follows:

> All healthcare providers in California who submitted claims for payment through the Change Healthcare system since February 21, 2024.

61. The Nationwide Class and the California Class are referred to herein as "Class" unless otherwise specified.

62. Excluded from the Patient Class and the Healthcare Provider Class are Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

63. The Class is defined based on the information available to Plaintiff at this time. Plaintiff reserves the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

64. **Numerosity (Fed. R. Civ. P. 23(a)(1))**. The members of the Class are so numerous

that joinder of all members is impracticable.

65. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3))**. There are questions of law and fact common to the members of the Class that predominate over any questions involving only individual members, including:

a. Whether Defendants had a duty to safeguard the information systems targeted in the Data Breach;

b. Whether Defendants knew, or should have known, of the susceptibility of their information systems to attack;

c. Whether Defendants were negligent in maintaining, protecting, and securing their information systems;

d. Whether Defendants were negligent in failing to adequately monitor, audit, and repair the information systems;

e. Whether Defendants adequately addressed vulnerabilities that enabled the Data Breach;

f. Whether Defendants failed to take reasonable security measures with respect to their information systems;

g. Whether Defendants failed to comply with applicable laws, regulations, and industry standards related to their information systems;

h. Whether Defendants failed to comply with their own policies and procedures related to their information systems;

i. Whether Defendants violated federal statutes including without limitation HIPAA and FTCA;

j. Whether Defendants had a duty to maintain a backup system sufficient to enable

healthcare providers to receive payment for services in the event of a data security incident;

k. Whether Defendants' failure to maintain a backup system to enable healthcare providers to receive payment for services in the event of a data security incident; and

l. Whether Plaintiff and the Class are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

66. **Typicality (Fed. R. Civ. P. 23(a)(3))**. Plaintiff's claims are typical of the claims of the Class because all experienced interruptions to their businesses and financial harm as a result of the Data Breach and resulting shutdown, and due to Defendant's acts and omissions.

67. **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**. Plaintiffs will fairly and adequately represent the interests of the class. Plaintiff's interests are not antagonistic or irreconcilably conflict with the interests of the members of the class. Plaintiff is represented by attorneys who are competent and experienced in class action litigation.

68. **Superiority (Fed. R. Civ. P. 23(b)(3))**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

69. Alternatively, Defendants have acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

**COUNT ONE**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

70. Plaintiff re-alleges each of the allegations set forth in the preceding paragraphs.

71. Defendants owed Plaintiff and the Class a duty to act with reasonable care to ensure continuity of their Defendants' networks and transactional services, and to ensure that their revenue cycle services would be adequately performed, including by way of timely and accurate claims processing. Defendants assumed this obligation and utilized their information systems in the performance of their services on behalf of Plaintiff and the Class.

72. In regard to their information systems, practices, and protocols, Defendants knew or should have known of the necessity to, *inter alia*, heed credible security warnings; maintain adequate patch management policies and procedures; detect alerts in regard to vulnerabilities affecting its systems; properly update and patch third-party software, update software regularly, implement third-party patches when issued, and prioritize patches by the severity of the threat; properly use automated tools to track which versions of software were running and whether updates were available; and implement appropriate procedures to keep security current and address vulnerabilities, including to monitor expert websites and software vendors' websites regularly for alerts about new vulnerabilities.

73. It was reasonably foreseeable to Defendants that Plaintiff and the Class would suffer such harms in the event of a cyberattack such as the Data Breach.

74. Defendant owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, using, and protecting PII and PHI from unauthorized access by third parties. The duties owed by Defendant to Plaintiffs and the Class include, but are not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding,

deleting, and protecting PHI and PII within their possession;

b. To follow its own policies and procedures and terms of service related to privacy and PHI/PII data protection;

c. To protect PHI and PII in its possession by using reasonable and adequate data security practices and procedures to inhibit and prevent compromise of PHI and PII;

d. To implement multi-layered security protocols, audits, evaluation, and stress testing policies;

e. To implement practices and procedures to quickly detect and timely act on data breaches.

75. Defendant breached its duty owed to Plaintiffs and the Class by its acts and omissions.

76. Defendant knew or should have known the risks of maintaining and storing PHI and PII, the importance of following published and industry-standard security protocols, and the importance of maintaining secure digital infrastructure.

77. Through Defendant's acts and omissions described in this Complaint, Defendant failed to provide adequate security to protect the PHI and PII it maintained and stored.

78. Defendant breached its duty by negligently, carelessly, and recklessly collecting, maintaining, and controlling its customers' sensitive personal information and engineering, designing, maintaining, and controlling systems that exposed their customers' sensitive personal information of which Defendant had control and possession to the risk of exposure to unauthorized persons.

79. Defendant further breached the duty it owed to Plaintiff and class members in the

following ways:

a. Failing to implement adequate and reasonable security systems, protocols, and practices sufficient to protect PHI and PII, creating a foreseeable risk of harm;

b. Failing to comply with the minimum industry security standards for data security;

c. Failing to act despite knowing or having reason to know that Defendant's digital infrastructure was vulnerable to attacks.

80. Plaintiff and the Class Members were foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in failing to heed credible security warnings; failing to maintain adequate patch management policies and procedures; failing to detect alerts in regard to vulnerabilities affecting its systems; failing to properly update and patch third-party software, update software regularly, implement third-party patches when issued, and prioritize patches by the severity of the threat; failing to properly use automated tools to track which versions of software were running and whether updates were available; and failing to implement appropriate procedures to keep security current and address vulnerabilities, including to monitor expert websites and software vendors' websites regularly for alerts about new vulnerabilities.

81. Defendants' duties extended to protecting Plaintiff and the Class Members from the foreseeable risk of foreseeable hacking conduct of third parties, including because Defendants' own actions and omissions exposed Plaintiff and similarly situated parties to the harm flowing from the disruption of routine, timely processing of patients' insurance claims and insurers' payments for services

82. As a result of Defendants' negligence, Plaintiff and Class members suffered injuries and damages that include loss of revenue. Such damages can be proven formulaically by, for

example, taking into account the number and amount of bills that Plaintiff and Class members were unable to submit during the shutdown period.

83. The injury and harm that Plaintiff and the Class has suffered and will continue to suffer was the direct and proximate result of Defendants' negligent conduct.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

a. An Order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs and their Counsel to represent the Classes;

b. An Order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

c. Damages in an amount to be determined by the trier of fact;

d. Declaratory and injunctive relief;

e. Plaintiff's reasonable attorneys' fees, costs, and expenses;

f. Pre- and post-judgment interest on any amounts awarded; and

g. Such other and further relief as may be just and proper.

## VII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: April 19, 2024

Respectfully submitted,

/s/ *Murray B. Wells*
Murray B. Wells
**WELLS & ASSOCIATES, PLLC**
81 Monroe Avenue, Suite 200
Memphis, TN 38103
Tel: (901) 808-0000
wells@thewellsfirm.com

Adam J. Zapala *(pro hac vice forthcoming)*
Elizabeth T. Castillo *(pro hac vice forthcoming)*
Andrew F. Kirtley *(pro hac vice forthcoming)*
Kevin J. Boutin *(pro hac vice forthcoming)*
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road,
Burlingame, California 94010
Tel: (650) 697-6000
azapala@cpmlegal.com
ecastillo@cpmlegal.com
akirtley@cpmlegal.com
kboutin@cpmlegal.com

Arthur M. Murray *(pro hac vice forthcoming)*
Stephen B. Murray, Jr. *(pro hac vice forthcoming)*
Ruston Pritchard *(pro hac vice forthcoming)*
**MURRAY LAW FIRM**
701 Poydras Street, Suite 4250
New Orleans, LA 70139
Tel: (504) 525-8100
amurray@murray-lawfirm.com
smurrayjr@murray-lawfirm.com
rpritchard@murray-lawfirm.com

*Counsel for Plaintiff*